## ROSE KUSHNER *vs.* DRAVO CORPORATION.

Middlesex. November 5, 1958. — May 26, 1959.

Present: WILKINS, C.J., RONAN, SPALDING, WILLIAMS, COUNIHAN, WHITTEMORE, & CUTTER, JJ.

*Blasting. Negligence,* Blasting, Contractor. *Evidence,* Relevancy and materiality, Of negligence in blasting. *Practice, Civil,* Charge to jury.

At the trial of an action against a contractor for consequential injury to the plaintiff's dwelling from concussion while the defendant was blasting in solid subsurface rock during performance of a contract for public construction, contract specifications requiring that "Blasting shall be done with explosives of such power and in such quantities and positions as will not . . . damage any existing structures. To this end, every

blast . . . shall be exploded, by use of delays, in stages consistent with the location, type and character of the rock" might properly be considered as evidence of what was due care in the circumstances. [277]

A finding that a contractor performing a public construction contract was negligent in doing blasting in solid subsurface rock resulting in injury to a nearby dwelling through concussion was warranted by evidence that the contract specifications required use of "delays," that a "single charge generates more earth movement and concussion at one time than a series of . . . delays," that it was "usual and standard procedure to use delays in solid rock," that single charges and not "delays" were used at the time of the injury to the dwelling, and that thereafter "delays" were used and no damage to property occurred. [278–279]

In an action against a contractor for consequential injury to the plaintiff's dwelling from concussion while the defendant was blasting, where there was uncontradicted evidence that the defendant was duly licensed to engage in blasting, it was prejudicial error on the part of the trial judge to charge that whether or not the defendant was properly licensed was an issue for the jury and that, although the defendant was not an "insurer," his holding of a license did not "give . . . [him] a right to be negligent and on the contrary it may be considered by a jury a factor in the determining of . . . [his] conduct." [279–280]

TORT. Writ in the Superior Court dated February 26, 1954.

The action was tried before *Cahill,* J.

The case was argued in November, 1958, before *Wilkins,* C.J., *Spalding, Williams, Counihan,* & *Whittemore,* JJ., and afterwards was submitted on briefs to all the Justices.

*Thomas D. Burns,* (*William H. Clancy* with him,) for the defendant.

*Thomas A. Brett,* for the plaintiff.

WHITTEMORE, J. The plaintiff had a verdict in this action of tort to recover for damage to the plaintiff's dwelling house at 375 Broadway, Somerville, allegedly caused by negligent blasting by the defendant under a contract with the metropolitan district commission (the commission). The defendant excepted to the denial of its motion for a directed verdict, to the admission of evidence of an alleged expert on blasting called by the plaintiff, and to the judge's charge.

The jury could have found facts as follows: The defendant, under the contract, was excavating a shaft ("Shaft 9") to connect with a tunnel to be used to provide water for the

Boston metropolitan area. This shaft was approximately 1,450 feet from the plaintiff's house.

The plaintiff was in her home on March 16, 1953, at two o'clock in the afternoon when she heard "sort of a roar or rumble." She was "jounced." She heard falling objects downstairs. All of her canned goods in the pantry had fallen to the floor. Objects fell from a table and a vase toppled over. There were cracks in several ceilings and a, stairway was "slanted." On March 17 before six o'clock in the morning she heard another "roar" which shook the house. There were similar occurrences on March 18 at about quarter of five in the afternoon but not thereafter.[1]

The defendant's daily blasting report showed that the defendant set off a blast of 180 pounds on March 16 at 2 P.M., no blast on March 17, a blast of 180 pounds on March 18 at 5:45 P.M., and a blast of 163 pounds on March 20. It showed also that beginning on March 23, all blasts were set off with the use of "delays," that is, the total charge of powder was divided into several smaller charges, each of which was set off successively. Delays were not used in any of the blasts prior to March 23, but were used on April 3 when the pounds detonated were 172; on March 24 for 212 pounds; March 30, 200 pounds; April 4, 212 pounds; and April 11, 208 pounds. Other poundages after March 23 were larger.

The contract specifications required that "Blasting shall be done with explosives of such power and in such quantities and positions as will not . . . damage any existing structures. To this end, every blast in the shaft shall be exploded, by use of delays, in stages consistent with the location, type and character of the rock. . . . The contractor . . . will . . . be held responsible for and shall make good any damage to other property whether or not owned by the commission." The department of public safety rules and regulations form Y provides: "In blasting operations, no charge shall be used in any one blast which will result in

[1] The plaintiff in answer to interrogatories had said that damage occurred on March 16, 1953, and various other dates over a two months' period, but left it by her testimony at the trial that the damage occurred on three days and "might" have occurred later in the period.

injury to persons or property. When it is necessary to blast in close proximity to a building or other structure, light face blasts only, with short lines of resistance and small charges, shall be used. . . ."

There was testimony that a single charge generates more earth movement than a series of delays. An expert for the defendant testified that "[i]t is usual and standard procedure to use delays in solid rock."

The daily report shows progressive lower elevations from —12 feet on March 23 to —172 feet on May 9, 1953. The —12 figure means 12 feet below sea level which in the shaft was about 60 feet below the surface. The overburden was about 28 feet. The blasting was all in bedrock except to remove occasional large boulders in the overburden. Testimony that on March 23 the depth was 60 feet (or 63 feet as shown on the daily report) and the overburden was 28 feet, permitted the conclusion that the blasting had been in solid rock for some time. The daily record sheet shows that in rock the average increase in depth from blast to blast (with no blasting on some days) was about 6½ feet. March 21 and 22, 1953, were respectively Saturday and Sunday. The jury could have concluded therefore that on March 16 and 18 (and on the 17th if there was a blast on that day) the defendant was blasting in solid rock.[1]

The defendant admits that the testimony would warrant a finding of causation (see *Coffey* v. *West Roxbury Trap Rock Co.* 229 Mass. 211, 213; *Dalton* v. *Demos Bros. Gen. Contractors, Inc.* 334 Mass. 377) but not of negligence.

1. A majority of the court thinks there was evidence of negligence. The contract which in its requirement of delays made specific the provision of the rule for the use of small charges where necessary to avoid injury was of course not admissible to establish a duty to the plaintiff. In *Hampson* v. *Larkin,* 318 Mass. 716, we held that the charge was correct that the owner's contractual obligation to the builder

---

[1] There was testimony that the solid rock or ledge began at 60 feet below the surface, but this was before the witness corrected his first testimony that the overburden ("the material covering the rock") was about 60 feet in depth. He left it that the overburden was 28 feet.

did not vary or heighten the duty of the owner to an injured architect to have reasonably safe instrumentalities; the contract did not make the defendant an insurer. The principle exemplified in that case does not however bar the contract as evidence of negligence. The defendant owed a duty to all persons whose property might be injured to refrain from negligent operation. *O'Regan* v. *Verrochi*, 325 Mass. 391, 392–393, and cases cited. The contract requirement did not alter that duty but it did furnish some evidence of what was due care in the circumstances. The safety requirements of the contract were, in the first instance, imposed by a public agency, experienced in construction, for the protection of the public. The standard of care thus established was comparable to those which might be imposed by a municipal ordinance or a departmental regulation. The contract made specific for this work the safety regulation of the department of public safety. The contractor, by executing the contract, joined in imposing the safety requirements as a term of the contract, and hence in establishing the standard. The contractual standard is somewhat analogous to that imposed by company rules, the violation of which may be evidence of negligence. See *Stevens* v. *Boston Elev. Ry.* 184 Mass. 476, 479–480; *McNeil* v. *New York, N.H. & H. R.R.* 282 Mass. 575, 577. Our cases have long held that evidence of a general practice or of what is customarily done by others may, in the judge's discretion, be received on the issue of negligence. *Myers* v. *Hudson Iron Co.* 150 Mass. 125, 138. *Hendrick* v. *Boston & Albany R.R.* 170 Mass. 44, 48. *Dolan* v. *Boott Cotton Mills*, 185 Mass. 576, 579. *Moynihan* v. *Holyoke*, 193 Mass. 26. *Draper* v. *Cotting*, 231 Mass. 51, 59. *Edgarton* v. *H. P. Welch Co.* 321 Mass. 603, 609. See *Corthell* v. *Great Atl. & Pac. Tea Co.* 291 Mass. 242, 243–244; *Robitaille* v. *Netoco Community Theatre of No. Attleboro, Inc.* 305 Mass. 265, 268. Wigmore on Evidence (3d ed.) § 461 (6). We think that what is required, for safety, by the experienced public body for which the work is being done, and is agreed to by the contractor, stands at least as high as evi-

dence of what is done to assure safety by others whose business is like the defendant's. See *Stewart* v. *Hanreddy,* 212 Mass. 340, 342.

The Judicial Council, in their Thirty-third Report (1957), Pub. Doc. No. 144, in commenting on a proposed act to provide "that the doctrine of res ipsa loquitur shall be applicable in actions for damages caused by blasting or the keeping of explosives" said: "In these days blasting has become a public necessity — like the use of dangerous cars on the highways and safety rules are needed . . . ." We agree, and we rule, that the precautions required by the public agency causing the blasting to be done, in reasonable implementation of such rules, are some evidence of what due care requires.

The failure to take the care required in the circumstances is further evidenced by the testimony of the defendant's expert, that "It is usual and standard procedure to use delays in solid rock." This evidence makes the cases above cited directly applicable.

We need not appraise the evidence for possible "rational inferences" (*Goldman* v. *Regan,* 247 Mass. 492, 495) to support a conclusion that the defendant was negligent. Nor do we reach the question of whether blasting contrary to the contractual requirements was, because unauthorized, a nuisance on which liability could be predicated. See *Hakkila* v. *Old Colony Broken Stone & Concrete Co.* 264 Mass. 447; *Czapski* v. *Sun Oil Co.* 303 Mass. 186; *Malm* v. *Dubrey,* 325 Mass. 63, 65–66 (noise).

2. The jury could have concluded that the plaintiff's damage resulted from the defendant's negligent failure to use delays. There was, it is true, no direct testimony to this effect. We disregard the testimony of the plaintiff's witness Champa. His knowledge of blasting was confined to that acquired from practical experience in surface blasting and his testimony that "nothing would have happened if precautions had been taken . . . I would have used lesser charges," does not stand as that of an expert in the effect of blasting in subsurface bedrock. It is not apparent that

anything to which he was able to testify as an expert warranted the acceptance of his qualifications. There was ground for excluding or striking his testimony. But the nonexpert inference which Champa drew could have been drawn by the jury from the facts that, where delays were used with somewhat comparable and larger amounts of powder, no damage occurred, and the testimony of the defendant's expert that a "single charge generates more earth movement and concussion at one time than a series of relays or delays." The inference from this expert testimony that more damage occurred on March 16 from one charge than would have occurred from the same amount of powder set off in successive smaller blasts is strong. Though it is weaker, we think there is some basis for the inference that with the use of delays no damage at all would have occurred.

There being, in the opinion of the majority, enough evidence to permit a recovery under the rule, as now stated, applicable to damage by concussion or vibration caused by blasting (*Coughlan* v. *Grande & Son, Inc.* 332 Mass. 464, 467, and cases cited) there is no occasion to reconsider that rule which is not in effect in most other jurisdictions.[1]

3. There was error in the charge in respect of the defendant's license to blast. The evidence showed that a license was required to blast between sunset and sunrise and that

---

[1] The persuasive argument for strict liability for damage from concussion or vibration as well as from thrown debris is restated in the recent cases of *Whitman Hotel Corp.* v. *Elliott & Watrous Engr. Co.* 137 Conn. 562, 568–569, and *Bedell* v. *Goulter,* 199 Ore. 344, 348–349. See also *Exner* v. *Sherman Power Constr. Co.* 54 F. 2d 510, 514 (2d Cir. A. N. Hand, Cir. J.); Harper and James, Torts, § 14.7; Prosser, Torts (2d ed.) § 59; Smith, Liability for Substantial Physical Damage to Land by Blasting — The Rule of the Future, 33 Harv. L. Rev. 542, 667; Restatement: Torts, § 519. The effect of the minority rule has been tempered or avoided in a number of jurisdictions which retain it. See *Ledbetter-Johnson Co.* v. *Hawkins,* 267 Ala. 458; *Bacon* v. *Kansas City Terminal Ry.* 109 Kans. 234; *Marlowe Constr. Co.* v. *Jacobs,* 302 S. W. 2d 612 (Ky.); *Philpot* v. *Rhinesmith,* 6 N. J. Super. 324; *Coley* v. *Cohen,* 289 N. Y. 365; *Dixon* v. *New York Trap Rock Corp.* 293 N. Y. 509, 513–514; *Vincent* v. *Hercules Powder Co.* 228 App. Div. (N. Y.) 118; *Kaminsky* v. *Purcell & Gilfeather, Inc.* 158 N. Y. S. 165; *Peterson* v. *State,* 2 N. Y. S. 2d 921, 926; *Klostermann* v. *Houston Geophysical Co.* 315 S. W. 2d 664 (Tex. Civ. App.), compare *Universal Atlas Cement Co.* v. *Oswald,* 138 Texas, 159, *McKay* v. *Kelly,* 229 S. W. 2d 117 (Tex. Civ. App.), affd. sub nom. *Kelly* v. *McKay,* 149 Texas, 343. The criticism of the minority rule was noted in *Sullivan* v. *Commonwealth,* 335 Mass. 619, 628–629, n.

the defendant was duly licensed; also that its blasting permit bond, although cancelled in 1954, had been in effect in 1953. There was no contrary evidence. The judge charged, "It appears that the defendant was licensed by the authorities to engage in blasting and I think that was put in issue in the arguments yesterday, whether it was properly licensed. Whether the defendant was is for the jury to say. It is an issue in any event." The judge went on to say that assuming the defendant was properly licensed that did not give it "the privilege of being negligent. However, the fact that a license has been granted is one of the facts along with other evidence which the jury can consider in determining the conduct of the defendant, namely, whether he has been acting as a careful, prudent and cautious person. . . . [T]he defendant is not an insurer and in connection with that keep in mind that the license doesn't give a defendant a right to be negligent and on the contrary it may be considered by a jury a factor in the determining of the conduct of the defendant." The possibility of prejudice to the defendant in these instructions was such that the verdict should not stand.

*Exceptions sustained.*